## Case No. 5,924.
### HALL'S DEPOSITION.
[1 Wall. Jr. 85.][1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1843.

PEDIGREE—HEARSAY—PRESUMPTION OF DEATH.

1. Presumption of death does not arise from the fact that a person who twenty-two years ago was in "bad health," would, if now living, be eighty years old; not even although on recent inquiry his name was not known at the post-office of a large city, (his former residence.) nor inserted in its directory:—there being no evidence of the sort nor degree of bad health, nor of inquiries having been made about him among his friends, nor of his having ever left the place of his former residence.

2. The question whether or not declarations post litem motam are evidence in matters of pedigree, is largely examined on the authorities, English, American and continental; and the court declares, in opposition to rulings in this circuit temp. Washington, that they are not: but these rulings are not positively overthrown; the case going off on the point stated in the first paragraph.

[Cited in Banert v. Day, Case No. 836.]

In ejectment the plaintiff claimed title through J. P. who was alleged to be heir at law of the original owner; and to prove the heirship, offered in evidence the deposition of one Zebulon Hall, regularly taken in New York, A. D. 1822, in an ejectment then pending in this state, for other land by this same plaintiff against a different defendant, and where the fact in dispute was the heirship. The evidence was offered not as a deposition, but as a declaration concerning pedigree. As ground for the offer it was proved that when Hall's deposition was taken, in 1822, he was fifty-nine years old, and in bad health; that on recent inquiry at the New York post-office, no person named Zebulon Hall was known there, and that the name was not found in any late New York directory. Hall lived in New York when his deposition was taken. No evidence was given to shew the nature nor the extent of Hall's bad health; nor that his name had been in more ancient directories; nor that he had ever left New York; nor that prior to offering the deposition any inquiry had been made concerning his friends or relatives, or whether they knew any thing of his existence or death.

For the evidence it was argued, that the balance of probability preponderated in favor of Hall's death. He would, if alive, be 80 years old; an age to which but a small majority even of the persons who reach 50, ever attain. This was true of persons favoured by robust health. But here is a man whose health

is bad. It is not necessary to inquire into the diagnosis of his case. "Bad health," means health that is likely soon to decay. We are thus asked to suppose, that a sickly, diseased man has reached an age which even the robust are rarely so strong as to be able to attain. A specifick danger is always to be regarded, when there is a question as to a presumption of death. Watson v. King, 1 Starkie, 121; Sillick v. Booth, 1 Younge & Coll. Ch. 117, 120. The case of ill health, and that of age also, is mentioned in the books. See Webster v. Birchmore, 13 Ves. 362, where "a very bad state of health" was a strong circumstance in accelerating a presumption of death; though, indeed, there were others in that case. In Rex v. Inhabitants of Harborne, 4 Nev. & M. 341, 345, Lord Denman asks: "Can there be the same presumption as to a party who is 100 and one who is 35; as to a party who was in good health when last heard of, and one who was proved to have then had a disorder upon him which was likely speedily to terminate in his death? It cannot be." The continental jurists speak the same language. Among several questions to be put by the judge before a decision involving a presumption of death, is this: "Cujus esset aetatis ille absens? An is absens sui natura esset robusti vel debilis corporis?" Menochius de Presumptionibus, lib. 6, pr. 49. Then Hall's existence was unknown at a department which, by its duty and employment, is conversant with the names of all residents in its neighbourhood; nor is his name to be found among those where the residents of a city are oftener recorded than omitted. Any one of these facts would afford a presumption of death. All four united afford a strong presumption. Death being presumed, the declaration is clearly admissible in this circuit. This point was settled in Boudereau v. Montgomery [Case No. 1,694], where, after full argument at the bar, and an able opinion from Judge Washington, depositions like the present were read to the jury. The same point had been ruled in Banert v. Day [Id. 836]; and, as we may infer from that case, had been decided in Hurst v. Jones [Id. 6,934], under the former organization of this court. It is not at all necessary to inquire into the decisions of other courts: our own practice is settled.

BALDWIN, Circuit Justice. Supposing Hall's death to be proven, the same question arises here as we find in Boudereau v. Montgomery [supra]. That decision is one which I had occasion to consider a good deal in a suit which came before me a few years ago. I then felt reluctant to overrule it: the same reluctance yet exists. I feel, that in the first place it is a precedent, and, yet more, that it is a precedent left to us by a judge of great learning, of the utmost patience, and largely endowed with that finest, rarest, last betrayed of the qualities of human intellect; I mean with good judgment. I can never dissent from my honoured predecessor,

---

[1] [Reported by John William Wallace, Esq.]

Judge Washington, without diffidence, and without feeling that in such a case he is likely to be right and I am likely to be wrong. Still, it is not in the nature of human minds to view every thing in the same way; and where great principles are concerned, it may be obligatory on each to give utterance to his opinion.

Before examining the state of the law as elsewhere existing, I will say a word as to the cases in this circuit. Boudereau v. Montgomery was in affirmance of a former ruling reported in 3 Wash. [Case No. 836]; C. C. 243, the case, I mean, of Banert v. Day [supra]. Like many of the cases in what are called Washington's Circuit Court Reports, (a book printed from Judge Washington's notes never originally designed for the press,) this case is stated short and almost in the form of a syllabus; the ground of the ruling and the arguments of counsel being wholly omitted. It appears only that the counsel who argued in favour of the depositions, relied on the case of Hurst v. Jones [supra], decided in this circuit under the organization of 1801–2. We cannot tell what view of that case was given to the court; but I have been at some pains to learn what the case really was: and through the kindness of a friend am in possession of the original, contemporary MS. notes of the reporter of that court, and also with the notes of one of the judges. Each is full; and both accord. I will state that case: it is an interesting one. (His honour here stated the case, for a full report of which, see [Case 6,934].) It is obvious that Hurst v. Jones was no precedent for Banert v. Day; quite the contrary: and if this last case was ruled on the authority of the former decision, and Boudereau v. Montgomery, in turn, settled upon the base of Banert v. Day: then, that we might exclude the deposition here offered, without so much disturbing the precedents of the circuit as making them conform to the case by which they were meant to be guided, and from which they have diverged only through imperfect observation.

It would appear, however, from the learned argument of Judge Washington, in Boudereau v. Montgomery (and, indeed, from his direct statement,) that the ruling in that case, conformed ·to what he deemed the prevailing temper of the American decisions, (as well as of the English prior to the Berkeley Peerage Case,) and to the better sort of principles in the law of evidence. Let these be shortly examined.

The first English case recorded is that of Spadwell v. ——, which arose before Chief Baron Reynolds, in 1730, where the declarations of an aunt as to pedigree were rejected because made after dispute had arisen. 4 Camp. 410. Thirty-six years afterwards came Hayward v. Firmin, before Lord Camden, where the declarations of a mother as to her marriage, though made subsequently to the commencement of the suit, were received after objection taken and debate had. Judge Washington remarks that Lord Camden's decision, being later in point of time, over-rules that of Chief Baron Reynolds; and so truly it would do, but that it appears that the decision of Chief Baron Reynolds was not brought to the notice of Lord Camden, and, for aught that we can perceive, was unknown to him. Id. 417. Both cases are nisi prius decisions, and neither is very copiously reported; they cannot, I think, be taken as of much significance, nor as settling a great deal either way. In 1741, Duke of Athol v. Wilding occurred (2 Strange, 1151), where a special verdict given many years before against other defendants, was offered in evidence to prove pedigree. The court (Wright, J., dissenting) rejected it as being res inter alios acta, and because, for aught that appeared, the evidence on which the verdict was founded, could, itself, be procured. In that case the right to admit as declaration what was inadmissible as deposition was a refinement of ingenuity to which the talent of neither court nor counsel was able to reach; and so the matter of post litem motam was not discussed. So far, however, as the decision is concerned, it is clearly against the offer made here. This case is supposed by some to have been over-ruled. The idea is founded on what occurs in Buller's Nisi Prius, where it is said: "Another case in which this exception (res inter alios acta) ought not to be allowed, is, where the fact to be proven is such whereof hearsay and reputation are evidence; and therefore a special verdict between other parties stating a pedigree would be evidence to prove a descent.....And of this opinion was Mr. Justice Wright, &c., which opinion is generally approved, though the determination by the rest of the court was contrary; perhaps founding themselves on the Case of Sir William Clarges, &c., &c." London Ed. 1793, p. 233. The Case of Sir Wm. Clarges, which the author proceeds to state, would appear to me a very proper one for the judges on which to found themselves. It is to be observed that no case is referred to but the Duke of Athol's: no precedent nor any practice is cited to contradict that case: we are told simply that Wright's opinion "is generally approved." Opposed to this evidence of approval, we have, however, the experience of Baron Wood, who says in 1811, that it had been the "general rule," so far back as his experience and knowledge went, to reject declarations made post litem motam; and though his Brother Graham had not become acquainted with any such rule in any book that ever came within his reading, and thought that if it were a rule at all, it was one confined to the breasts of a few particularly conversant with the business of nisi prius; we find Mr. Justice Lawrence declaring that in his experience and practice, "an experience of nearly forty years," whenever a witness admitted that what he was going to state, he had learned after the commence-

ment of a controversy, his testimony had been uniformly rejected. With him agrees Mr. Justice Heath, who says: "In the course of my long experience, in all the circuits I have gone, I never heard till now of such evidence being receivable. When the ob-jection that the declaration was post litem motam has been taken. it has been con-stantly acquiesced in;" and Lord Eldon, who tells us: "I have known no instance in which declarations post litem motam had been re-ceived;" and Lord Redesdale, who can take upon himself to say, that the practice of the Western circuit was to reject such declara-tions; and that circuit, he remarks, was supposed by those who travelled it, to be more correct on subjects of evidence than any other.

The first edition of Buller's Nisi Prius ap-peared in 1772; and the direct or indirect experience of some of the judges just cited reached near the time to which the author must be taken to refer. I therefore presume that the statement made in it, that the dis-senting opinion of Wright, J., was "generally approved," in opposition to a decision of the court, must be taken as a misapprehension as to the precise extent of professional ap-probation. I may here add, what is not al-ways remembered in citing Buller's Nisi Prius, that though the book bears on its title the name of Francis Buller, it was printed pretty much from the note-book of Lord Chancellor Apsley, by whom it was published, and to whom it was originally inscribed. Sev-eral of its dicta have been over-ruled. No other case worthy of note occurs to me as having been decided prior to our Declaration of Independence. In the year 1777 we have Goodright v. Moss, Cowp. 591, before the Earl of Mansfield; a case which Lord Eldon in-forms us that Lord Thurlow was "most stu-dious to contradict." Mr. Justice Lawrence, referring to that case. says: "Notwithstand-ing what is said in Goodright v. Moss, I can-not think that Lord Mansfield would have held that declarations in matters of pedigree, made after the controversy had arisen, ought to be submitted to the jury;" and Lord Eldon acceded to the case "as it has been practised and acted upon." For myself, I confess that it does appear to me to evolve the dry point which occurs in the case before us; but I think that it was a point which escaped in-considerately, and only along with others which carried it through. Certainly it was one not necessary to be decided; and the question of lis mota was not taken nor ar-gued either on the bench or at the bar. Thus stood the law at the beginning of the present century. I may say that the precise question of lis mota does not seem to have been greatly agitated: that is, the books do not often speak of it: though it may have been discussed at nisi prius, on the circuits. I regard all that is recorded as not very de-cided one way or the other.

With the beginning of this century we have much more perfect lights. In 1807 came Whitelocke v. Baker, 13 Ves. 511, 514; a case not having, to be sure. any thing to do with pedigree, but yet stating some salutary rules by which chancery is guided in the reception of evidence. It is in this case we find that expression of Lord Eldon's, which every one must have noted, that the statements should be "the natural effusions" of a party. Two years further on we have a decision of Sir W. Grant at the rolls. The question was as to the admissibility of a pedigree found among a lady's papers after death, and which she had made after doubts had arisen as to the descent. The evidence was rejected. Edwards v. Harvey. Coop. 39, 40.[2] We now come in sequence to a case vastly more laboured, more important and more entirely conclusive than any which preceded it; which excited great interest; was argued by distinguished counsel, and on which we have a decision of the house of lords after a full expression of opinion, only not unani-mous, from ten very able judges; Mr. Jus-tice Chambre, who had heard the argument, but was absent when the opinions were de-livered, agreeing. in addition, with the ma-jority. The Berkeley Peerage Case (decided in 1811) 4 Camp. 401, 422, has settled the law in England on foundations not to be disturbed nor relaid. I need, therefore, not refer to subsequent cases otherwise than suc-cinctly. Rex v. Cotton, 3 Camp. 444, was ruled by a judge who did not sit in the Berkeley Peerage Case; but he agrees with it, and on principle. Another judge has gone yet further than either of these cases. In 1834 Baron Alderson ruled that less than the existence of actual controversy is enough; that in intendment of law, a controversy is moved whenever that state of facts arises on which the claim is founded (Walker v. Countess of Beauchamp, 6 Car. & P. 552, etc.), and rejected evidence accordingly. And though Lord Brougham did not go so far as this in Monkton v. Attorney General, 2

---

[2] This case was an application to Sir W. Grant for a new trial of an issue which he had directed and which had been once tried before Baron Graham. who had likewise rejected the evidence. Mr. Hubback, in his recent valuable work on the Evidence of Succession. &c. re-marks of the paper, that "it is not clear wheth-er it was rejected upon the ground that it had been made after the doubts had arisen as to the pedigree, or because the person who made it had, herself, an interest in establishing the relationship." Page 661. And he notes the fact that in the Berkeley Peerage Case, decided only four years after this, Baron Graham dis-claimed all knowledge of the rule of lis mota; and hence appears to doubt if the case of Ed-wards v. Harvey is an authority on that sub-ject. It is to be remarked, however, that though Cooper's report is deficient in fulness, the circumstance of lis mota does make a con-siderable figure in it: and as it is not at all necessary that Sir W. Grant should have re-jected the evidence for the same reason which may have most impressed Baron Graham, we may perhaps regard Mr. Justice Baldwin's cita-tion of the case, as not without good ground.

Russ. & M. 147, he did most clearly acknowledge the rule of the Berkeley Peerage Case. Observe his language: "One restriction, however, clearly must be imposed: the declarations must be ante litem motam. If there be lis mota, or any thing which has precisely the same effect upon a person's mind with litis contestatio, that person's declaration ceases to be admissible in evidence. It is no longer what Lord Eldon calls a natural effusion of the mind. It is subject to a strong suspicion that the party was in the act of making evidence for himself. If he be in such circumstances that what he says, is said, not because it is true, not because he believes it, but because he feels it to be profitable, or that it may hereafter become evidence for him or for those in whom he takes an interest after his death, it is excluded, both upon principle and upon the authority of the cases, and among others, of Whitelocke v. Baker." There is nothing contradicting this authority in Slaney v. Wade, 1 Mylne & C. 338, nor in any other case known to me. What is to be regarded as a lis pendens, in the understanding of law, is a point about which some of the later cases are not consentient; but the principle of the Berkeley Peerage Case (the only principle in the question before me) I take to be ineradicably fixed, in England. This indeed Judge Washington admits; but says that Whitelocke v. Baker and the Berkeley Peerage Case [supra], having been decided since our Revolution, are not authorities; that the question must be, how has the point been understood in this country before and since that event? and remarks that as the nisi prius decisions referred to by the judges in the Berkeley Peerage Case (the decisions, I presume, of Chief Baron Reynolds and Lord Camden) were never in print, they could not have influenced the law in this country. This statement proceeds on a misapprehension of fact. Chief Baron Reynolds' decision, excluding evidence post litem motam, was in print, though I am not aware that the same thing is true of Lord Camden's admitting it. In Viner's Abridgment. the first edition of which was printed before 1776, (a book which, if we may infer from the number of American subscribers to the second edition, was very popular in this country,) we have the following passage, which occurs in speaking about a statement made by a certain woman as to the birth of a child: "Objection was made," says Viner, "that the declaration of this woman was not evidence, seeing it was &c. when there was a discourse about this matter; *but what this woman said soon after the birth* (the italicising is Viner's) *was allowed in evidence, when there was no prospect of a controversy:* per Reynolds, C. B., at Devon. Assizes, Lent, 1731." Vin. Abr. tit. "Evidence. T," b. 91.

But what, at all events, is the state of the decisions in this country prior to Boudereau v. Montgomery [Case No. 1,694]? The oldest one known to me is in our own state: the case of Strickland's Lessee v. Poole, 1 Dall. [1 U. S.] 14, decided in 1765; a case which, remarkable to say, does not appear to have been remembered either by counsel or by the court in Boudereau v. Montgomery. That decision does make the absence of any controversy an element of the case in which hearsay is admissible. The report is thus: "To prove pedigree, evidence permitted to be given of hearsay a great while ago—before any dispute stirred." In Hurst v. Jones, A. D. 1801, the court evidently took a distinction between ante and post litem motam, and admitted the declaration because, as was declared, a controversy had not been raised. Coming nearer to the decision in question. we have an opinion of the supreme court of Connecticut, as delivered by Chief Justice Swift. Speaking of declarations concerning pedigree the chief justice says: "When they are made for the express purpose of being given in evidence on a question of pedigree, they will not be received. If a person were to take up a Bible, and, having the idea that it was afterwards to be produced in evidence, were to write down, at once, the births and deaths of his children; such an entry would not be admissible." Chapman v. Chapman, 2 Conn. 347, 349. This case was not cited before Judge Washington; but certainly the distinction is stated, though I admit that it was not the point in issue.

Now, I know not of any decisions contradicting these. In the cases quoted by counsel before Judge Washington, the question of lis mota does not appear to have been agitated: they relate rather to the effect of verdicts between parties, privies, and strangers. Such are the cases, if I understand them, from Henning and Munford, and from Munford; while the additional references by the court give us nothing very pertinent on the subject; and, indeed, are cited for their general language only. Two of them, the one from 1 Yeates, and that from 8 Johnson. assert only that in matters of pedigree, the rules of evidence are greatly relaxed; a doctrine not disputable: the other is from Swift's Law of Evidence, and, I presume, to the same general effect. We have at all events. the opinion of that writer specifically declared to us from the bench. Judge Washington, with the candour natural to him, says, that he "had no opportunity of looking into the American cases." Had this opportunity been allowed, I cannot think, that even with the decisions to be found in 1821, when Boudereau v. Montgomery was decided, he would have added, as he did: "But I am strongly inclined to think, from expressions to be met with in many of the state decisions, that the rule of post litem motam has never been recognized in the United States."

My limited reading suggests nothing from which I can infer that the main current of decisions since 1821. has gone in a course different from what it did prior to that date.

In Morgan v. Purnell, 4 Hawks, 95, the supreme court of North Carolina went so far as to reject a deposition because it was not clear that it was made ante litem motam. "It must appear," says one of the justices, "that such declarations have not been made at a time or with a view to serve any particular purpose. In this case it does not appear when Mrs. M. told the witness that she and Mr. M. were married: it might have been, for aught that appears, before or after the commencement of this suit. For these reasons I cannot say that the judge erred in the rejection of this deposition."....."It is necessary," says another member of the court, "that they (st. declarations concerning pedigree) should have been made not only without any view of benefiting the person making them, but also without a view of benefiting any other; that they should have flowed from a desire only of speaking the truth, which all are presumed to have when there is no motive to declare the contrary. The person therefore who offers such declarations must shew that they were made under such circumstances: it is a pre-requisite to their admissibility......The depositions must be rejected." The chief justice assenting, the judgment of the court below, which had likewise rejected the depositions, was unanimously affirmed. This case went farther than I was disposed to do on a recent trial;[3] though, indeed, the case just cited was not there brought before the court; and there was, too, in that case another circumstance which on reflection occurred to me:—that the fact of heirship was in dispute only incidentally; the main defence having been adverse possession. The North Carolina case, just quoted, was in 1825. It was affirmed, as of course, in 1837; the court having moreover changed. Dancy v. Sugg, 2 Dev. & B. 515.

But is not the question concluded in all inferiour courts of the United States, by the decision of the supreme court in Stein v. Bowman? made in 1839 (13 Pet. [38 U. S.] 209, 220); though I did not entirely agree with the majority of the court on some other points, not important to be mentioned, of the opinion there delivered. After going through some of the errours assigned to the action of the district court below, Mr. Justice McLean proceeds: "But there is another ground on which the opinion of the district court can be sustained, and it is proper to state it. The declarations offered as evidence were made subsequent to the commencement of the controversy, and, in fact, after the suit was commenced. It would be extremely dangerous to receive hearsay declarations in evidence respecting any matter, after the controversy has commenced. This would enable a party, by ingenious contrivances, to manufacture evidence to sustain his cause. By interrogatories propounded in a cautious manner to unsuspecting individuals,

he might elicit the answers he most desired. It is therefore essential, when declarations are offered as evidence, that they should have been made before the controversy originated, and at a time and under circumstances when the person making them could have no motive to misrepresent the facts." I have gone through all the cases on my notes or which memory suggests. There may be others, in the multiplication of modern books, which I do not recall, but I presume that they are not numerous. How then does the question appear to stand? In England we have opinions from Lords Eldon, Redesdale, Ellenborough, Brougham; from Chief Baron MacDonald, Barons Wood and Alderson; from Sir William Grant, M. R.; and from Justices Bayley, Lawrence, Heath, Chambre and Dampier. In our own country, from the supreme court of the United States, the supreme court of Pennsylvania, the supreme court of Connecticut, the supreme court of North Carolina (twice) and from the circuit court of this circuit as organized in 1801–2; a court which consisted of Chief Justice Tilghman of Pennsylvania, Justice Griffith of New Jersey (an able man,) and Justice Basset of Delaware. All these judges and courts speak more or less fully, and all give it as their opinion that the declarations, to be admissible, must be before a controversy stirred.

The rule of the civil law is sufficiently known, and is thus given by Mascard, in his learned work "De Probationibus:" "Nec vero tantummodo debent esse personae graves, sed etiam debent deponere se audivisse ea quae asserunt, ante litem motam: quod si post litem motam deponerent, non solum non probarent, sed nec ullam fidem facerent; quia facile contingere potest ut quispiam id audiverit ab alio, qui illud protulit in fraudem, vel quod lis ipsi mota traxerit istam famam." I am far from meaning to cite a civilian as authority; but in a question concerning the safety of a practical rule, the experience of old and corrupter countries is a source of information not wholly without value. It is not necessary to place this matter upon the technical ground that the case of Boudereau v. Montgomery [supra], has been over-ruled by Stein v. Bowman [supra]. I am willing to look at it with more comprehension. We do then certainly find a power of authority and of judicial declaration not to be resisted. If the doctrine could not stand on principle, no judge could sustain himself against so commanding a body of names. They embrace the great masters of law and of thought for more than fifty years together: I must bow to them.

It is scarcely needful that I say much as to general principles. They have been so fully discussed in the leading case quoted by me, that I will only refer to what is there said. I need not repeat it. I cannot improve it. Whomsoever the Berkeley Peer-

3 [See Dussert v. Roe, Case No. 4,200.]

age Case leaves unconvinced I should not hope to satisfy. Necessity is the principal argument for admitting this sort of evidence. On this point only I will say, that this is a thing very easy to assume, whether it exist or not. I apprehend that if parties understand that they must bring purer evidence, the necessity will disappear; and if in a few cases the rule operates with severity upon individuals, it is in this, as in many other cases, only the sacrifice that is to be made to a greater and more general good. My sincere respect for the learning and wisdom of Mr. Justice Washington, and the force with which on a former occasion (though before the decision in Stein v. Bowman) his ruling was pressed on me, have made me go thus at large into the subject. I need not, perhaps, have said so much; for the depositions in this case are inadmissible on another ground, and on that I prefer to decide the point:—There is no evidence that Hall is dead, or that his deposition could not be had in a more regular way.

The life of a person once shown to exist is intended to continue till the contrary is proved, or is to be presumed from the nature of the case. Direct proof is not here offered. Are the facts which are shown sufficient to supply its place? The witness, if alive, is eighty years old; an age that we may admit is an advanced one; but is yet one to which life is occasionally, nay, not unfrequently prolonged. The court cannot, therefore, presume, as of course, that Hall has not reached it. Lord Hale has indeed said that it shall be presumed life will not exceed ninety-nine years. Weale v. Lower, Poll. 55, 67. And it may be inferred that a man, if of any age already, will not live eighty years besides. Napper v. Sanders, Hut. 118; Keeble's Case, Litt. 370. But Chief Baron Reynolds refused to presume a witness dead, who had been examined sixty years before; there having been no proper searches or inquiry made after him. Benson v. Olive, 2 Strange, 920. Neither does the circumstance that the witness was in bad health in 1822, infer, as necessary consequence, that he is now dead. The difficulty is here:—that the expression "bad health" is indeterminate. There are manifold sorts of bad health, and many degrees in most of them. Shew me that Hall was the subject of some quick consuming disease, or of any specifick malady at all, and you will change the case. Suppose that his bad health was temporary, or that the expression means only that his health was not robust. A man in bad health at one time may recover afterwards: that depends entirely upon the nature of his disorder, and mode of treatment, and the vigour of his constitution. And the valetudinarian often prolongs an existence beyond him who, in the carelessness of health, may be suddenly cut down. In the case cited from 13 Vesey, the health was "very bad," (the chancellor speaks of it as "des-

11FED.CAS.—14

perate,") and the man was to have been heard of in six months after he went away; several years before. The case from Nevile & Perry goes only to shew that the presumption of life or death is a question of fact entirely. With both cases I agree. Is the case essentially changed by the inquiries made at the post-office? This difficulty occurs: that there is nothing to shew that Hall was a person likely to be known there; that he was in the habit of receiving letters, or that he was a person of any note or consequence. It is no presumption of law that the runners of the post-office know, so as to answer at first inquiry, the name and residence of every person in a populous city. Remarks of a similar sort apply to the inference which would be drawn from the absence of the name from the directory. Indeed, in the insignificance of advanced old age, a man has generally ceased to make impression on the busy world, or to be enrolled in the register of its active concerns.

It seems to me difficult to suppose that direct evidence cannot be given of a death which, if it has occurred, has occurred close to us, and since 1822. Or did Hall ever leave the place of his former residence? let this fact be shewn; and that his friends have not heard of him for seven years. Had he no friends? let that fact be shewn. The difficulty is, that the plaintiff don't shew that he has made proper search or inquiry for Hall. Had he done this, and been unable to hear any thing of the person, I should be of opinion to receive the testimony. But there is a meagerness about all this part of the case, which is unsatisfactory; to use no harsher adjective. It shuts up the access to presumption which would have otherwise been easy. The case is much like that of Benson v. Olive, already referred to. In short I see nothing in any of the circumstances shewn, nor in all of them together, which, in the absence of proper inquiry, brings that weight and conclusiveness which ought to exist before you set aside a wise and deep-laid rule of law.